## IN THE UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF MICHIGAN

Epic Games, Inc.,

                        Plaintiff,

       v.

Idris Nahdi and Ayob Nasser,

                    Defendants.

Case No.

## **COMPLAINT**

Plaintiff Epic Games, Inc. ("Epic" or "Plaintiff") brings the following complaint against Defendants Idris Nahdi and Ayob Nasser (collectively, "Defendants"):

## I.    NATURE OF CASE

1. Founded in 1991, Epic is a leader in the interactive entertainment and 3D engine technology fields. Over the past thirty years, Epic has created some of the most highly acclaimed and commercially successful video games and immersive digital content and experiences.

2. One of Epic's most famous successes is *Fortnite*, a multiplayer online experience where over 500 million registered players interact across a wide variety of game modes and social entertainment experiences.

3. *Fortnite* includes thousands of player-made games and experiences

(known as "Islands") that span across genres, including adventure, roleplay, survival, and more. *Fortnite* players can create their own Islands using Unreal Editor for *Fortnite* ("UEFN"), a creation tool provided by Epic that gives players creative freedom, before sharing those Islands with millions of other *Fortnite* players.

4.     Player-created Islands are an important part of the *Fortnite* community. They keep existing players engaged in *Fortnite*, while also building and expanding the *Fortnite* community. As a result of the popularity of player-created Islands, Epic established its "Island Creator Program" to reward Island creators and developers (hereafter "developers") with monetary payouts based on other *Fortnite* players' engagement with the developers' Islands. Under the Island Creator Program, Epic places certain proceeds into an "engagement pool" and publishers of all eligible Islands share in payouts from the pool on a monthly basis. These payouts are calculated based on a variety of metrics that measure how many and how often players engage with a developer's Island, including the number of new *Fortnite* players that engage with a developer's Island, how often players return to the developer's Island, and how much time those players spend on the developer's Island, among other metrics.

5.     Unfortunately, some Island developers—like Defendants—have abused the Island Creator Program. Between December 2024 and February 2025,

in direct violation of their agreements with Epic, Defendants created thousands of fake "bot" player accounts to simulate real human *Fortnite* engagement on their Islands. Bot accounts are automated and do not reflect genuine human player engagement. The bot accounts were created and used by Defendants to artificially inflate the appearance of new player engagement with Defendants' Islands and improperly earn higher monetary payouts through Epic's Island Creator Program. Defendants' illicit scheme resulted in tens of thousands of dollars in unwarranted payouts.

6.      Defendants' actions harm Epic and the *Fortnite* community. Epic has invested significant time and resources to develop its Island and rewards program, and Defendants' abuse has harmed Epic's goodwill and its reputation among developers and players. Before they got caught, Defendants were paid tens of thousands of dollars in unearned payments from Epic that would otherwise have been paid out to other developers who earned genuine engagement from real *Fortnite* players. Epic has also spent substantial resources investigating Defendants' conduct and working to implement safeguards against unearned payments.

7.      As a result of Defendants' egregious conduct and resulting damage to Epic and its developers and players, Epic brings this action seeking damages and injunctive relief against Defendants for (i) breach of the *Fortnite* EULA, Epic

Terms of Service, and Engagement Program Payout Terms (against all Defendants); (ii) copyright infringement in violation of the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq*. (against all Defendants); and (iii) fraud in the inducement (against Idris Nahdi).

## II.    JURISDICTION AND VENUE

8.    This Court has jurisdiction over the subject matter of Epic's federal claim under 28 U.S.C. §§ 1331 and 1338(a) because this action arises under the Copyright Act, 17 U.S.C. §§ 106 and 501, *et seq*.  This Court has supplemental jurisdiction over Epic's related state law claims under 28 U.S.C. § 1367.

9.    This Court has personal jurisdiction over Defendants because they are citizens of Michigan and each resides in Wayne County in this District.

10.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1400(a) because Defendants reside in this District, and a substantial part of the events giving rise to Epic's claims occurred in this District.

## III.    THE PARTIES

11.    Epic is a corporation duly organized and existing under the laws of the state of Maryland.  Epic has its principal place of business in Wake County, North Carolina.

12.    Idris Nahdi is an individual who resides in Dearborn, Michigan.

13.    Ayob Nasser is an individual who resides in Dearborn, Michigan.

## IV.   FACTS APPLICABLE TO ALL CLAIMS

**A.   Epic and *Fortnite***

14.    Founded in 1991, Epic is a Cary, North Carolina-based company and leader in the interactive entertainment and 3D engine technology fields.

15.    Epic created and operates *Fortnite*, a multiplayer online experience where over 500 million registered players interact across a wide variety of game modes and social entertainment experiences.

16.    *Fortnite* was released broadly on July 25, 2017, and *Fortnite*'s extremely popular free-to-play "Battle Royale" game was released to the public on September 26, 2017.  *Fortnite*'s Battle Royale involves dropping a maximum of 100 players into a large map where the players battle each other until only one player (or team) remains standing.

17.    In order to play *Fortnite*, players must create an Epic Games account. The account is solely for that player's personal use.  A player creates an account using their email address and provides a username and password to log into their account.

18.    *Fortnite* is free to download, but players have the option to purchase an in-game digital currency (called "V-bucks"), which can then be exchanged for in-game cosmetics and other virtual items.

**B.      Epic's Copyrights in *Fortnite***

19.     Epic is the author and owner of all rights and title to the copyrights in *Fortnite*, including, without limitation, in its computer software and audiovisual works.

20.     Epic's relevant copyrights in various versions of *Fortnite*'s computer code and audiovisual works are the subjects of U.S. Copyright Registrations listed in the table below.

| Title | Registration No. | Registration Date | Nature of Work |
|---|---|---|---|
| *Fortnite* | TX 8-766-571 | Jan. 31, 2019 | Revised computer program |
| *Fortnite* | TX 8-507-210 | Mar. 21, 2018 | Revised computer program |
| *Fortnite* | PA 2-066-544 | Sept. 13, 2017 | Revised computer program; audiovisual material |
| *Fortnite* | TX 8-186-254 | July 14, 2015 | Computer program |
| *Fortnite* | TX 8-254-659 | Mar. 3, 2016 | Computer program |
| *Fortnite* | TXu 1-895-864 | Dec. 18, 2013 | Computer program |
| *FORTNITE* (2016 Rev. 2) | TX 8-352-178 | Dec. 23, 2016 | Computer program |
| *Fortnite* – Battle Royale Mode | PA 2-087-919 | Mar. 23, 2018 | Revised and new audiovisual material |
| *Fortnite* Battle Royale Chapter 5 Season 1 | TX 9-420-173 | July 3, 2024 | Computer program; audiovisual material |
| *Fortnite* Chapter 4: Season OG | TX 9-388-536 | Apr. 25, 2024 | Computer program; audiovisual |
| *Fortnite* Reload | TX 9-437-406 | Sept. 17, 2024 | Computer program; audiovisual material |

| *Fortnite* (Rev. 3) | TX 8-508-464 | Sept. 8, 2017 | Computer program; audiovisual material |
| --- | --- | --- | --- |

True and correct copies of the certificates of registration for the above-listed copyrights are attached as **Exhibit 1**.

### C.    Epic's Efforts to Reward Developers

21.    In order to play *Fortnite*, players must agree to the *Fortnite* End User License Agreement (the "*Fortnite* EULA").  When players download *Fortnite*, the *Fortnite* EULA is displayed on-screen for the players to accept before they can play *Fortnite*.  This is true for accounts created on all devices and platforms.

22.    Players, including Defendants, must affirmatively accept the *Fortnite* EULA by checking a box that reads, "I have read and agree with the End User License Agreement." After clicking that box, the person accepting the agreement must confirm a second time by clicking an "Accept" button before playing.  If a player does not complete these steps, the player will not be able to play *Fortnite*. A true and correct copy of the *Fortnite* EULA is attached as **Exhibit 2**.

23.    The *Fortnite* EULA grants a "personal, non-exclusive, non-transferable, non-sublicensable limited right and license to install and use" *Fortnite*, subject to several license conditions.

24.    Among other conditions, a *Fortnite* licensee may not:

(a)    "use it commercially or for a promotional purpose except as

Epic expressly authorizes;" or

(b)     "behave in a manner which is detrimental to the enjoyment of
        [*Fortnite*] by other users as intended by Epic, in Epic's sole
        judgment, including but not limited to… spamming, social
        engineering, [and] scamming."

25.     The *Fortnite* EULA terminates "automatically without notice if you
fail to comply with any of its terms and conditions."  "Upon any termination, the
License will automatically terminate, you may no longer exercise any of the rights
granted to you by the License, and you must destroy all copies of [*Fortnite*] in your
possession."

26.     In order to play *Fortnite*, players must also agree to the Epic Games
Terms of Service (the "Epic Terms").  The Epic Terms are expressly incorporated
by reference in the *Fortnite* EULA.  A true and correct copy of the Epic Terms is
attached as **Exhibit 3**.

27.     Among other conditions, the Epic Terms state that players are only
"permitted to use the Services for your personal, non-commercial use only or
legitimate business purposes related to your role as a current or prospective
customer of Epic."

28.     In March 2023, Epic launched the Unreal Editor for *Fortnite*
("UEFN"), giving players a new way to create and edit user-generated content.

UEFN can be used to create "Islands," standalone experiences within the *Fortnite* ecosystem that can be accessed and enjoyed both alone and with other players.

29.     Alongside the launch of UEFN, Epic announced updates to the "Island Creator Program"—the system Epic uses to reward content developers— establishing a new way for eligible Island developers to receive money based on other *Fortnite* players' engagement with the developers' Islands.

30.     Under the Island Creator Program, Epic places 40% of the net revenue from *Fortnite*'s Item Shop and related real-money purchases into an "engagement pool."  Epic divides the engagement pool based on the popularity of different experiences, including developers' Islands and Epic's own content like Battle Royale, and makes monthly payments to the publishers of all eligible Islands.

31.     Epic also publishes a list of engagement stats so that developers are aware of the types of metrics that determine the engagement payouts for the developers' Islands.  At the program's launch, these stats included:

> (a)     Player Popularity: Islands that attract new players and re-engage lapsed players signal an experience that *Fortnite* players love, so the number of players newly joining *Fortnite*, and lapsed players returning to *Fortnite* contribute to this calculation; and

> (b)     Player Retention: Islands where players return day-to-day and

week-to-week indicate compelling gameplay, so consistent play

and returning players contribute to this calculation.

32.     Other metrics that Epic currently factors into engagement payouts

include Active Playtime (the amount of active time players spend on a developer's

Island), Active Players (the number of daily unique users on a developer's Island),

and Returning Players (players who visit a developer's Island on their first day

back after being absent from *Fortnite* for at least 28 days), among other stats.

33.     Developers must agree to the Engagement Program Payout Terms in

order to receive any real-money rewards from Epic in connection with user-

generated content.  A true and correct copy of the Engagement Program Payout

Terms is attached as **Exhibit 4**.

34.     Among other conditions, the Engagement Program Payout Terms

expressly prohibit "Fake Engagement," meaning that developers "may not do

anything that causes or encourages any artificial manipulation of genuine User

engagement, including by using automatic systems or providing third parties with

incentives to increase artificial traffic, or otherwise manipulate metrics in any

manner."

35.     One form of fake or artificial engagement is the use of "bot" accounts.

Bot accounts are automated accounts that are not operated by a person, but are

designed to mimic real players.  The bot accounts are used to artificially increase

engagement in order to inflate a developer's engagement numbers.  Fake engagement, like the use of "bot" accounts, is expressly prohibited by the Engagement Program Payout Terms.

36.     In the event of a breach of the Engagement Program Payout Terms, Epic reserves the right to withhold payments (including by halting payments or deducting owed amounts from future payouts), removing the developer from the program (in which case the developer "may not use another Account to circumvent these restrictions"), and suspending or terminating the user's account.

37.     The Engagement Program Payout Terms are designed to reward legitimate developers whose Islands are enjoyed by real players, while simultaneously preventing bad actors from wrongfully obtaining engagement payouts and shrinking the pooled amount available through the Island Creator Program to legitimate *Fortnite* developers.

## D.     Defendants' Unlawful Acts

38.     Defendants Idris Nahdi and Ayob Nasser each created *Fortnite* accounts and each agreed to the *Fortnite* EULA, the Epic Terms, and the Engagement Program Payout Terms.

39.     Defendant Idris Nahdi first accepted the Engagement Program Payout Terms for a developer account on December 30, 2023.

40.     Defendant Ayob Nasser first accepted the Engagement Program

Payout Terms for a developer account on March 4, 2024.

41.    Defendants created multiple *Fortnite* accounts, in some cases providing inaccurate or incomplete personal information to Epic to do so. Defendants then used the accounts to create and publish a small number of *Fortnite* Islands.  Defendants worked together to create multiple Islands in an attempt to disguise their scheme by spreading the fake engagement across multiple developer accounts and Islands.

42.    Defendants then created and used thousands of fake bot accounts to artificially engage with the Islands they had published in order to illicitly increase their engagement payouts.

43.    Defendants' artificial engagement scheme began in December 2024 and continued through February 28, 2025.  During that time, Defendants artificially created over 20,000 fake bot accounts.  Defendants programmed the bot accounts to engage with Defendants' own *Fortnite* Islands by using a cloud gaming service that allows users to play video games, like *Fortnite*, remotely.

44.    Defendant Idris Nahdi created approximately 10,000 bot accounts to engage with Defendants' own Islands.  These fake bot accounts accounted for over 90% of the visitors to several of Defendants' Islands.

45.    Similarly, Defendant Ayob Nasser created approximately 5,000 fake bot accounts to engage with Defendants' Islands, accounting for over 90% of the

visitors to several of Defendants' Islands.

46.     Bot accounts associated with one Defendant were often used to access Islands published under the name of another Defendant.

47.     These bot accounts exclusively engaged with maps created and published by the Defendants.

48.     Defendants' fake bot artificial engagement was designed to generate unearned payouts from Epic's Island Creator Program.

49.     As a result of Defendants' artificial engagement in December 2024, they received tens of thousands of dollars for the supposed "engagement" on their Islands.

50.     After they had received payouts for the December 2024 artificial bot engagement, Defendants began using additional Epic Games accounts to create Islands.  On January 8, 2025, Defendant Idris Nahdi accepted and entered into the Engagement Program Payout Terms with Epic in connection with another Epic Games account.

51.     By accepting the Engagement Program Payout Terms in January 2025, Nahdi misrepresented to Epic that he intended to comply with those terms— i.e., refrain from artificial engagement—despite having no intention of doing so.

52.     Epic relied on this misrepresentation in order to unknowingly permit Nahdi's additional account to participate in the Engagement Program.  Epic's

reliance on Nahdi's misrepresentation was justified because, at the time Nahdi agreed to the Engagement Program Payout Terms on a new account on January 8, 2025, Epic had no reason to know that Nahdi had used bots to artificially increase engagement on his Islands. Had Epic known Nahdi had done so and intended to continue to do so, Epic would not have permitted Nahdi to participate in the Island Creator Program with that account.

53.     Nahdi intended to induce Epic's reliance on his misrepresentation. Nahdi had accepted the Engagement Program Payout Terms in connection with other accounts previously and knew that artificial engagement was prohibited by those terms, and further knew that Epic could suspend or terminate his accounts if he violated those terms. Nahdi knew that if he did not accept the Engagement Program Payout Terms, he could not participate in the Island Creator Program with that account.

54.     After accepting the Engagement Program Payout Terms in January 2025, Nahdi continued to use artificial engagement methods. Defendant Ayob Nasser also continued to use artificial engagement methods during this time.

55.     Epic became aware of suspicious activity on Defendants' Islands only after Defendants were paid out for their purported December 2024 "engagement." Epic subsequently investigated Defendants' conduct and confirmed that for nine of Defendants' ten Islands that received engagement payments, over 80% of the

engagement on those Islands was artificial.  In some cases, over 99% of the engagement on Defendants' Islands was artificial.

56.     As a result, Epic began withholding Defendants' engagement payout amount attributable to artificial engagement in January and February 2025. However, Epic has been unable to recover the significant payments made to Defendants from their artificial engagement in December 2024.

57.     After Epic reduced the payouts, Defendants' artificial engagement activity dropped significantly, indicating the Defendants were aware their scheme had been detected.

58.     By creating thousands of accounts to remotely access Epic's services and artificially inflate engagement statistics, Defendants have breached their agreements with Epic and infringed Epic's copyrights.

59.     By earning unauthorized payouts through artificial engagement, Defendants breached the *Fortnite* EULA and Epic Terms by using *Fortnite* commercially without Epic's authorization, as well as by behaving in a manner that was "detrimental to the enjoyment of [*Fortnite*] by other users."

60.     Defendants breached the Engagement Program Payout Terms by using bot accounts to artificially manipulate the metrics used to measure engagement on player Islands.

61.     Defendants knew that their conduct constituted a breach, and that the

breach was not justified.

62.     As a result of the breach, the respective *Fortnite* EULAs between Epic and Defendants automatically terminated, and they were required to destroy all copies of *Fortnite* in their possession.

63.     Defendants did not destroy their copies of *Fortnite*, and instead continued to download and access *Fortnite*.  Defendants therefore infringed Epic's copyrights by continuing to use unlicensed copies of *Fortnite* after their *Fortnite* EULA with Epic terminated.

64.     By falsely representing that he would not use artificial means to increase engagement metrics on Defendants' Islands on January 8, 2025, Nahdi fraudulently induced Epic into allowing him to continue participating in the Island Creator Program.

65.     Defendants' conduct has caused significant harm to Epic and the *Fortnite* community.

66.     Defendants have wrongfully obtained unearned payments from Epic.

67.     Defendants have also harmed Epic's goodwill with the *Fortnite* community, as well as the reputation of the Island Creator Program.  Developers trust that the time spent creating Islands will be rewarded in accordance with the Engagement Program Payout Terms, and based on how real players engage with the Islands.  Defendants' conduct undermines Epic's relationship with developers,

however, depriving legitimate developers of the full share of funds they otherwise would have received and eroding the trust Epic has built with them.

68.     Epic has expended significant resources investigating and combating Defendants' conduct, including but not limited to identifying the scope and means through which Defendants obtained unearned engagement payouts, and developing guidelines and security measures to prevent similar efforts in the future.

## COUNT I
### Breach of Contract
### (Against All Defendants)

69.     Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 68 of this complaint, as if set forth fully herein.

70.     In order to play *Fortnite*, a player must agree to the *Fortnite* EULA. The *Fortnite* EULA grants a "personal, non-exclusive, non-transferable, non-sublicensable limited right and license to install and use" *Fortnite*, subject to several license conditions.

71.     Among other conditions, a *Fortnite* licensee may not:

(a)     "use it commercially or for a promotional purpose except as Epic expressly authorizes;" or

(b)     "behave in a manner which is detrimental to the enjoyment of [*Fortnite*] by other users as intended by Epic, in Epic's sole judgment, including but not limited to… spamming, social

engineering, [and] scamming."

72.    In order to play *Fortnite*, a player must also agree to the Epic Terms. Among other conditions, the Epic Terms state that players are only "permitted to use the Services for your personal, non-commercial use only or legitimate business purposes related to your role as a current or prospective customer of Epic."

73.    In order to receive engagement payouts in connection with the Island Creator Program, players must agree to the Engagement Program Payout Terms, expressly prohibiting players from doing "anything that causes or encourages any artificial manipulation of genuine User engagement, including by using automatic systems or providing third parties with incentives to increase artificial traffic, or otherwise manipulate metrics in any manner."

74.    Defendants accepted and agreed to the *Fortnite* EULA, the Epic Terms, and the Engagement Program Payout Terms.  In exchange, Epic granted them access to *Fortnite*.

75.    The agreements between Defendants and Epic are binding and valid.

76.    Through the conduct alleged herein, Defendants breached their agreements with Epic by creating thousands of fake bot accounts in order to artificially inflate engagement statistics and obtain unearned engagement payouts through the Island Creator Program.

77.    As a result of Defendants' actions, Epic has suffered damages in an

amount to be proven at trial.

## COUNT II
## Copyright Infringement
## (17 U.S.C. §§ 106, 501 *et seq.*)
## (Against All Defendants)

78.     Epic realleges and incorporates fully by reference the allegations in

paragraphs 1 through 77 of this complaint, as if set forth fully herein.

79.     Epic owns multiple valid, registered, and enforceable copyrights in

*Fortnite*.

80.     These copyrights are identified in the copyright registration

certificates referenced above and set out in Exhibit 1.

81.     In order to play *Fortnite*, a player must agree to the *Fortnite* EULA.

The *Fortnite* EULA grants a "personal, non-exclusive, non-transferable, non-

sublicensable limited right and license to install and use" *Fortnite*, subject to

several license conditions.

82.     The *Fortnite* EULA terminates "automatically without notice if you

fail to comply with any of its terms and conditions."  "Upon any termination, the

License will automatically terminate, you may no longer exercise any of the rights

granted to you by the License, and you must destroy all copies of [*Fortnite*] in your

possession."

83.     Defendants breached the *Fortnite* EULA by, among other things,

creating bot accounts and using them commercially in connection with *Fortnite*,

and to execute a scam to earn unauthorized engagement payouts.

84.     After breaching the *Fortnite* EULA, Defendants' license to download, play, and otherwise access *Fortnite* automatically terminated.  Defendants nonetheless continued to access *Fortnite* in violation of their agreement with Epic, and thus infringed Epic's copyrights.

85.     As a result of Defendants' infringement, Epic has suffered damages, including lost sales and profits.

86.     Epic is also entitled to recover Defendants' profits resulting from the infringement.

87.     Alternatively, Epic is entitled to statutory damages pursuant to 17 U.S.C. § 504(c).

## COUNT III
## Fraud in the Inducement
## (Against Idris Nahdi)

88.     Epic realleges and incorporates fully by reference the allegations in paragraphs 1 through 87 of this complaint, as if set forth fully herein.

89.     Once Defendant Idris Nahdi began to artificially inflate engagement statistics and obtain unearned engagement payouts through the Island Creator Program, in order to increase the scope of his scheme, Nahdi began using additional accounts to create more Islands and agreed to the Engagement Program Payout Terms on at least one of those accounts, knowing he did not intend to

comply with those terms.  In addition to the accounts and conduct described above, which began in December 2024, Nahdi agreed to the Engagement Program Payout Terms on at least January 8, 2025.

90.    By accepting the Engagement Program Payout Terms, Nahdi misrepresented that he would not do "anything that causes or encourages any artificial manipulation of genuine User engagement, including by using automatic systems or providing third parties with incentives to increase artificial traffic, or otherwise manipulate metrics in any manner."

91.    Nahdi's misrepresentation was reasonably calculated to deceive Epic into believing that he would abide by the contractual terms.

92.    Nahdi did not intend to abide by these contractual terms.  Nahdi created multiple accounts and entered into the contractual agreements for the purpose of using artificial engagement to wrongfully maximize unearned engagement payouts, and he immediately violated these promises by continuing to abuse the Island Creator Program.

93.    Nahdi was aware of the falsity of his representation because after he accepted the Engagement Program Payout Terms again in January 2025, he continued to use bots on his Islands in violation of those terms.  Nahdi intended to deceive Epic into paying Nahdi engagement payouts because he knew that Epic would not have permitted him to benefit from the Island Creator Program if Epic

knew his true intentions.

94.     Based on Nahdi's intentional misrepresentation, Epic was induced to allow him to participate in the Engagement Program and receive engagement payouts.  Had Epic known of Nahdi's intentions, Epic would not have allowed him to access or benefit from the Island Creator Program.  As soon as Epic became aware of Nahdi's wrongful actions, Epic intervened and prevented pending engagement payouts from being sent to Nahdi.

95.     Epic justifiably relied on Nahdi's misrepresentation because at the time Nahdi again agreed to the Engagement Program Payout Terms in January 2025, Epic had no reason to know that Nahdi had used bots to artificially increase engagement on his Islands, or that he intended to continue to do so.

96.     As a result of Epic's reliance on Nahdi's misrepresentation, Epic has suffered damage to its goodwill and lost resources, such as the monetary and personnel resources associated with investigating and redressing Nahdi's unauthorized activities, which Epic would not have been forced to expend but for Nahdi's misrepresentation.

97.     Epic is entitled to injunctive relief, compensatory damages, and any other remedy available at law or equity.

## V.     PRAYER FOR RELIEF

WHEREFORE, Plaintiff Epic Games, Inc. prays for the following relief:

A.     That judgment be entered in Epic's favor against Defendant Ayob Nasser on breach of contract and copyright infringement, and against Defendant Idris Nahdi on all claims.

B.     That Defendants and their officers, agents, representatives, servants, employees, heirs, successors, and assigns, and all others in active concert or participation with Defendants be permanently enjoined from:

    1)     Creating Epic Games accounts;

    2)     Receiving payments from Epic in connection with the Island Creator Program, or inducing, contributing, or enabling others to do the same;

    3)     Infringing, or inducing, contributing, or enabling others to infringe Epic's copyrights;

    4)     Downloading, installing, possessing, and/or using any of Epic's copyrighted works, including but not limited to *Fortnite*;

    5)     Accessing any server owned by Epic; and

    6)     Aiding or assisting another person or entity in any of the activities described in (1)-(5) above.

C.     An award to Epic of all damages permitted by law, including its costs incurred in this suit as well as reasonable attorneys' fees.

D.     Other such relief as the Court deems just and proper.

Dated:  October 7, 2025                      Respectfully submitted,

DICKINSON WRIGHT PLLC

By: **/s/ Sharae' L. Williams**
Aaron V. Burrell (P73708)
Davina Alean Bridges (P85597)
Dickinson Wright PLLC
500 Woodward Ave., Suite 4000
Detroit, MI 48226
(313) 221-3500
DBridges@dickinson-wright.com
ABurrell@dickinson-wright.com

Sharae' L. Williams (P82493)
Dickinson Wright PLLC
350 S Main St, Suite 300
Ann Arbor, MI 48104
(734) 623-7075
SWilliams@dickinsonwright.com

Katherine M. Dugdale (*attorney admission* forthcoming)
KDugdale@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, California 90067-1721
Telephone:  +1.310.788.9900

Jacob P. Dini (*attorney admission* forthcoming)
JDini@perkinscoie.com
PERKINS COIE LLP
1301 Second Avenue, Suite 4200
Seattle, Washington 98101
Telephone: +1.206.359.8000

*Attorneys for Plaintiff*